UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Minnesota Majority, Minnesota Voters
Alliance, Minnesota North Star Tea Party
Patriots, Election Integrity Watch, Susan
Jeffers, individually and as an election judge,
Dorothy Fleming, Jeff Davis, Dan McGrath
and Andy Cilek,

        Plaintiffs,

v.

Joe Mansky in his individual and official
capacity as the Elections Manager for
Ramsey County, Rachel M. Smith in her
individual and official capacity as the
Elections Manager for Hennepin County,
Mike Freeman in his individual and official
capacity as Hennepin County Attorney,
Susan Gaertner in her individual capacity,
John J. Choi in his official capacity as Ramsey
County Attorney, and Mark Richie in his
individual and official capacity as
Secretary of State,

        Defendants.

Civil No. 10-4401 (JNE/SER)
ORDER

Individual and institutional Plaintiffs assert violations of the United States and Minnesota

constitutions against Defendants, Elections Managers of Ramsey and Hennepin Counties,

County Attorneys for Ramsey and Hennepin Counties, and the Minnesota Secretary of State, in

their individual and official capacities.[1]  In broad terms, the claims arise out of allegations that

Minnesota Statutes section 211B.11, subdivision 1 (2010), which prohibits the wearing of

---

[1]      The Amended Complaint refers to Secretary of State Mark "Richie."  The Secretary of
State spells his last name "Ritchie" and the Court will refer to him by his correctly spelled name.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes John J. Choi
for Susan Gaertner in her official capacity.  Choi was sworn in as the Ramsey County Attorney
on January 4, 2011.

political buttons, badges, and insignia in and around the polling place, is facially unconstitutional

and that Defendants, in their implementation and enforcement of the statute, violated Plaintiffs'

rights to free speech, association, vote, equal protection, and due process under both the United

States and Minnesota constitutions.  The case is before the Court on Defendants' motions

pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Amended Complaint.  For

the reasons set forth below, the Court grants the motions.

## I.      BACKGROUND

On Monday, November 1, 2010, the Court heard Plaintiffs' motion for a Temporary

Restraining Order (TRO) and preliminary injunction.  Treating the motion as one for a TRO, the

Court found that Plaintiffs were not likely to succeed on the merits of their claims and denied the

motion.  On November 18, 2010, after the November election took place, Plaintiffs filed the

Amended Complaint.  The institutional Plaintiffs, Minnesota Majority, Minnesota Voters

Alliance, and Minnesota North Star Tea Party Patriots, assert that they are Minnesota 501(c)(4)

nonprofit organizations and that together they form a grass roots coalition called Election

Integrity Watch (EIW).  The individual Plaintiffs, Susan Jeffers, Jeff Davis, Dorothy Fleming,

Dan McGrath, and Andy Cilek, are eligible voters in Ramsey or Hennepin County; Susan Jeffers

is also an election judge in Ramsey County.[2]  Plaintiffs allege that Minnesota Statutes section

211.B11, subdivision 1, and the way it was enforced, wrongfully prohibited or chilled the

wearing of North Star Tea Party Patriots T-shirts and EIW buttons to the polls.  The buttons state

---

[2]      The Amended Complaint removed two of the original individual Plaintiffs and added
Andy Cilek.  Otherwise, the parties remain unchanged since the TRO.  Though the parties do not
dispute the issue of standing, the Court has the obligation to consider the issue independently.
Because Cilek has standing on each of the claims in the Amended Complaint, *see St. Paul Area
Chamber of Commerce v. Gaertner*, 439 F.3d 481 (8th Cir. 2006), the Court need not consider
whether the other Plaintiffs have standing.  *See Horne v. Flores*, 129 S. Ct. 2579, 2592-93
(2009); *Clinton v. City of New York*, 524 U.S. 417, 431 n.19 (1998) (finding that because health
care appellees have standing it did not matter whether their unions also have standing).

2

"Please I.D. Me" and include an image of an open eye, a telephone number, and a website address including the word "integrity."  (Am. Compl. Ex. A)  The T-shirts bear a "Tea Party Patriots" logo along with one of several slogans including "Don't Tread on Me" and "Fiscal Responsibility, Limited Government, Free Markets."  (Am. Compl. Ex. B)  The institutional Plaintiffs do not endorse candidates for election and, while the question of whether Minnesota law should be changed to require voters to identify themselves at the polling place is the subject of public and legislative debate, there was no issue relating to voter identification on the November 2, 2010, ballot.

Minnesota Statutes section 211B.11, subdivision 1 provides:

> A person may not display campaign material, post signs, ask, solicit, or in any manner try to induce or persuade a voter within a polling place or within 100 feet of the building in which a polling place is situated, or anywhere on the public property on which a polling place is situated, on primary or election day to vote for or refrain from voting for a candidate or ballot question.  A person may not provide political badges, political buttons, or other political insignia to be worn at or about the polling place on the day of a primary or election.  A political badge, political button, or other political insignia may not be worn at or about the polling place on primary or election day.

A complaint alleging a violation of section 211B must be filed with the Office of Administrative Hearings (OAH).  After OAH has finally disposed of the complaint, the alleged violation can be prosecuted by a county attorney as a petty misdemeanor.  Minn. Stat. § 211B.11, subd. 4.

For present purposes, the Court assumes that the allegations of the Amended Complaint, summarized below, are true.  Plaintiff and election judge Sue Jeffers approached Joe Mansky, Elections Manager for Ramsey County, asking about "rumors" she had heard about "Please I.D. Me" buttons and Tea Party T-shirts.  Mansky told Jeffers that the buttons and Tea Party messages of any kind would be prohibited at the polls.  Subsequently, but prior to November 2, Mansky told election judges that individuals at or "within 100 feet" of the polling place would be

asked to cover any "political shirt, hat button, badge or insignia."  He also stated that no

individual would be denied the right to vote.  Rachel Smith, Elections Manager for Hennepin

County, and Secretary of State Ritchie subsequently adopted the same policy.  The Amended

Complaint alleges that this policy applied "particularly" to the "Please I.D. Me" buttons and Tea

Party apparel.  (Am. Compl. ¶¶ 57-59)  Hennepin County Attorney Mike Freeman stated that

poll watchers wearing buttons asking voters for identification "won't be allow[ed] in polling

stations."  (Am. Compl. ¶ 61)  On October 30, 2010, Mansky drafted a memorandum on the

subject of "Displaying Campaign Materials in the Polling Place" (Election Day Policy).[3]  The

Election Day Policy directed election judges who saw individuals wearing political materials to

remove or cover the materials while "in the polling place."  (*Id.*)  Under the Election Day Policy

> [e]lection judges have the authority to decide what is "political."
> Examples include, but are not limited to:
> - Any item including the name of a political party in Minnesota, such as Republican, DFL, Independence, Green, or Libertarian parties.
> - Any item including the name of a candidate at any election.
> - Any item in support of or opposition to a ballot question at any election.
> - Issue oriented material designed to influence or impact voting (including specifically the "Please I.D. Me" buttons).
> - Material promoting a group with recognizable political views (such as the Tea Party, MoveOn.org, and so on).

Even if individuals refused to remove or cover prohibited items, the Election Day Policy directed

that they must be allowed to vote, though their names and addresses would be recorded and

referred "to appropriate authorities."  (*Id.*)

---

[3]      Each Defendant supplied a different copy of the Election Day Policy but each copy states an identical policy.  The versions provided by Hennepin County and the Office of the Secretary of State are dated November 1, 2010.  For ease of reference, the Court will refer to the version provided by Ramsey County.  (Mansky and Gaertner's Mem. in Supp. Mot. Dismiss, Edison Decl., Ex. A)

On election day, Jeff Davis, a registered voter in Ramsey County who had learned of this policy, was deterred from wearing a Tea Party T-shirt and a "Please I.D. Me" button.  Dan McGrath, a registered voter in Hennepin County, wore a "Please I.D. Me" button.  An election judge asked McGrath to cover the button, McGrath refused, and the election judge obtained his name.  Andy Cilek, also registered to vote in Hennepin County, wore both a "Please I.D. Me" button and a Tea Party T-shirt.  Election judges "refused to allow Mr. Cilek to vote" on two occasions.  Cilek did not vote "for over five hours."[4]  One voter wearing a Tea Party T-shirt was "interrupted" "during the voting process" and asked to remove or cover his Tea Party T-shirt. He was warned that if he did not, he could be prosecuted.  Some Hennepin County election judges allowed individuals, including Plaintiff Dorothy Fleming, to wear the "Please I.D. Me" buttons without asking them to cover or remove the buttons.  In unidentified counties, unidentified voters were allowed to vote wearing buttons affiliated with the Sierra Club and Minnesota Common Cause.  The Sierra Club endorses candidates and Minnesota Common Cause lobbies for legislation to reform the electoral process.[5]

Aspects of Plaintiffs' Amended Complaint are somewhat imprecise or otherwise difficult to decipher.  For example, the Amended Complaint alleges that the policy "exercises a standardless discretion over what expressive conduct is electioneering," when the word

---

[4]     Mr. Cilek was not, in fact, deprived of the right to vote.  (Am. Compl. ¶ 105)  At oral argument, Plaintiffs' counsel clarified that all of his clients voted.  The "five hours" seems to have been the elapsed time between Mr. Cilek's first and second trips to the polling place.  There is no allegation that he was detained or delayed at the polling place.

[5]     The Amended Complaint also alleges that "[t]he Defendants admit" that they adopted a policy prohibiting EIW "Please I.D. Me" buttons and Tea Party apparel and that they "did not enforce or otherwise apply a similar policy to other groups."  (Am. Compl. ¶ 117)  This allegation alone, in the context of the Amended Complaint which is pleaded only against policy-level Defendants, is a "'naked assertion' devoid of 'further factual enhancements'" which does not state a viable claim for relief.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

"electioneering," while it appears in Arizona's statute, *see Reed v. Purcell*, No. CV 10-2324, 2010 WL 4394289, at *1 (D. Ariz. Nov. 1, 2010); Ariz. Rev. Stat. § 16-515 (2010), does not appear in either the policy or the statute being challenged here.   Nonetheless, the Court has determined that Plaintiffs' four-count Amended Complaint alleges: (1) that Minnesota Statutes section 211.B11, subdivision 1, is a facially unconstitutional restriction of First Amendment rights under the United States Constitution and parallel rights under the Minnesota constitution (Count IV); (2) that section 211B.11, as applied in the Election Day Policy adopted by Hennepin and Ramsey Counties and the Secretary of State, violated Plaintiffs' First Amendment rights, their constitutionally protected right to vote, and parallel rights under the Minnesota constitution (Counts I and IV); (3) that the Election Day Policy violated Plaintiffs' due process rights under both the United States and Minnesota constitutions (Count II); and (4) that the Election Day Policy deprived Plaintiffs of equal protection under both the United States and Minnesota constitutions (Count III).[6]

## II.   DISCUSSION

When ruling on a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, a court must accept the facts alleged in the complaint as true and grant all reasonable inferences in favor of the plaintiff.  *Crooks v. Lynch*, 557 F.3d 846, 848 (8th Cir. 2009).  Although a complaint is not required to contain detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555).  "To

---

[6]     Plaintiffs repeatedly referenced a claim of retaliation in their memorandum and at oral argument, but the Amended Complaint does not refer to retaliation nor does it allege any facts regarding protected conduct or speech before or during the election which could have been the basis for retaliation.  *See Altonen v. City of Minneapolis*, 487 F.3d 554, 559 (8th Cir. 2007).  The Court finds that Plaintiffs have not pleaded a retaliation claim.

survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A court generally may not consider materials outside the pleadings when deciding a motion to dismiss under Rule 12(b)(6). *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 982 (8th Cir. 2008). The court may, however, "consider some public records, materials that do not contradict the complaint, or materials that are 'necessarily embraced by the pleadings.'" *Id.* (quoting *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)); *see In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 889 (8th Cir. 2002). The parties rely heavily on the written Election Day Policy in their memoranda and at oral argument, and they do not dispute the contents or authenticity of the document. Though the Election Day Policy was not attached to the pleadings, and the Amended Complaint makes reference to previously issued verbal iterations of the policy, no party has argued that consideration of the document will convert the motion to dismiss to a motion for summary judgment. At oral argument Plaintiffs clarified that it is their intent to "[i]n the very first instance, challenge this written policy with the State of Minnesota." Accordingly, the Court considers the Election Day Policy to be necessarily embraced by the pleadings and considers this to be the policy under attack in Plaintiffs' Amended Complaint. *See BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685 (8th Cir. 2003); *Porous Media Corp.*, 186 F.3d at 1079; *Silver v. H & R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997); *see also Pegram v. Herdrich*, 530 U.S. 211, 230 n.10 (2000). Additional documents were submitted by the parties but they are outside of the pleadings and thus are not considered in deciding the Rule 12(b)(6) motions. *See* Fed. R. Civ. P. 12(d).

7

**A.**      **Counts I and IV:  The Constitutionality of Minnesota Statutes Section 211B.11**

1.      Facial Challenge

The Amended Complaint claims that Minnesota Statutes section 211B.11 is facially

unconstitutional under both the United States and Minnesota constitutions.  (Am. Compl. ¶ 1)

Minnesota's guarantees of freedom of speech are coextensive with those of the federal

constitution and these claims are examined under the same standard.  *See State v. Wiklund*, 589

N.W.2d 793, 798-801 (Minn. 1999).  The statute is a content-based regulation because it only

prohibits badges, buttons, and insignia with a political message.  *See Burson v. Freeman*, 504

U.S. 191, 197 (1992).  Political speech "is at the heart of the protections of the First

Amendment."  *281 Care Committee v. Arneson*, No. 10-1558, slip op. at 19, n.3 (8th Cir. Apr.

28, 2011).  Indeed, the protections afforded to political speech under the First Amendment are

"difficult to overstate."  *Id.* at 19 n.3 (citing *Snyder v. Phelps*, 131 S. Ct. 1207 (2011); *Citizens

United v. FEC*, 130 S. Ct. 876 (2010)).  The level of scrutiny that the Court must use to evaluate

the constitutionality of the restrictions in section 211B.11, subdivision 1, depends upon the

forum in which the restrictions take place.  *See Cornelius v. NAACP Legal Def. & Educ. Fund,

Inc.*, 473 U.S. 788, 800-02 (1985).  Traditional public fora include public streets, parks, and

places that by either tradition or "government fiat have been devoted to assembly or debate."  *Id.*

In public fora, content-based restrictions are subject to strict scrutiny, i.e., they are prohibited

unless necessary to serve a compelling state interest and narrowly tailored to achieve that

interest.  *Id.*  Restrictions on speech in nonpublic fora are allowed as long as they are viewpoint

neutral and reasonable in light of the purposes served by the forum.  *Id.*

The Court will begin by assessing the first clause of section 211B.11, subdivision 1.  It

states that a person may not "display campaign material, post signs, ask, solicit, or in any manner

try to induce or persuade a voter within a polling place or within 100 feet" of polling locations. In *Burson v. Freeman*, the Supreme Court found that a substantively identical Tennessee law was constitutional.  504 U.S. at 193.  The Tennessee law examined in *Burson* prohibited "the display of campaign posters, signs or other campaign materials, distribution of campaign materials, and solicitation of votes for or against any person or political party or position on a question" within 100 feet of a polling place.  *Id.*  The *Burson* Court ruled that the law survived strict scrutiny as a "facially content-based restriction on political speech in a public forum."  *Id.* at 198.  There is no meaningful distinction between the Tennessee law and the first clause of section 211B.11.

The second part of section 211B.11, subdivision 1, restricts "political" material rather than "campaign" material and is geographically more limited because it applies only "at or about the polling place."  The briefing and argument in this case take for granted that the second clause of the statute applies only at the polling place and does not extend to the 100 foot area outside the polling place regulated by the first clause of section 211B.11; this comports with the Court's reading of the statute.  As such, the Court's analysis of the second clause applies to the polling place itself, not its surroundings.  The *Burson* Court examined the polling place *and* the area within 100 feet of the polling place and concluded that the area was "a quintessential public forum."  *Cf. id*. at 214 (Scalia, J., concurring) (expressing the view that the area outside of the polling place is a non-public forum subject only to the reasonableness test).  *Burson* does not control what level of scrutiny applies to restrictions on speech that apply only "at or about" the polling place.  At oral argument, the parties agreed that the polling place is a nonpublic forum and every federal circuit and district court that has addressed this issue has concluded the same. *See, e.g.*, *United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 749-50 (6th Cir. 2004); *Marlin v. D.C. Bd. of Elections & Ethics*, 236 F.3d 716 (D.C. Cir. 2001); *Am.*

*Fed. of State, Cnty. and Mun. Emps., Council 25 v. Land*, 583 F. Supp. 2d 840, 848-49 (E.D. Mich. 2008); *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 364-65 (S.D.N.Y. 2007).[7]   Section 211B.11's restrictions on speech "at or about the polling place" need only be viewpoint neutral and reasonable in light of the purpose served by the forum. *Cornelius*, 473 U.S. at 806 ("The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation.").

Section 211B.11, on its face, is viewpoint neutral.  It applies to any political badge or button, no matter what view it espouses. *See id.* at 811-12 ("[A] decision to exclude all advocacy groups, regardless of political or philosophical orientation, is by definition viewpoint neutral."). Section 211B.11 is also reasonably related to the legitimate state interest of "maintain[ing] peace, order, and decorum," *Mills v. Alabama*, 384 U.S. 214, 218 (1966), at polling places. *See Marlin*, 236 F.3d at 719-20 ("Because the Board's enforcement of [regulations barring political paraphernalia] to regulate political activity inside polling places is 'reasonable in light of the purpose for which the forum at issue serves,' given the history and function of polling places, we hold that the regulations do not violate the First Amendment." (citations omitted)); *cf. Burdick v. Takushi*, 504 U.S. 428, 438 (1992) ("[T]he function of the election process is to winnow out and finally reject all but the chosen candidates, not to provide a means of giving vent to short-range political goals, pique, or personal quarrel[s]." (citations and quotation marks omitted)); *Berner v. Delahanty*, 129 F.3d 20, 26-27 (1st Cir. 1997) (upholding ban on "political-advocacy buttons" in Maine superior court because the "courthouse is a place in which rational reflection and disinterested judgment will not be disrupted").

---

[7]     At oral argument, Plaintiff's counsel argued that *any* content-based restrictions on speech must meet "exacting scrutiny" regardless of the forum, citing *Burson*.  *Burson* does not stand for this proposition.  As explained above, *Burson* applied strict scrutiny to an area defined as a *public* forum.

2.      As-Applied Challenge

Plaintiffs next challenge section 211B.11 as it is applied by Defendants' Election Day

Policy.  Plaintiffs challenge the policy on the basis that it is not viewpoint neutral and that it is

not narrowly tailored to achieve a compelling state interest.  The Court has already explained that

the Election Day Policy need not be narrowly tailored to achieve a compelling state interest

because it restricts speech only in the polling place, a nonpublic forum.  Plaintiffs argue that the

Election Day Policy is not viewpoint neutral because it singles out their political paraphernalia

and organizations.  The Election Day Policy lists the "Please I.D. Me" buttons as an example of

material "specifically" "include[ed]" in the category of "issue oriented material."  The Tea Party

is listed alongside Moveon.org as an example of a group with "recognizable political views"

whose promotional materials are not allowed.  The inclusion of illustrative examples does not

alter the viewpoint neutrality of the policy.  The Election Day Policy applies to badges, buttons,

and insignia expressing all manner of political views.   The fact that the Election Day Policy was

promulgated following Plaintiff Susan Jeffers asking about "rumors" she had heard about the

buttons and T-shirts does not support a finding that the Election Day Policy is not viewpoint

neutral.  *See Hill v. Colorado*, 530 U.S. 703, 724-25 (2000) ("[T]he contention that a statute is

'viewpoint based' simply because its enactment was motivated by the conduct of partisans on

one side of a debate is without support.").  Neither is it determinative that the restrictions are

content-based.  "Implicit in the concept of the nonpublic forum is the right to make distinctions

in access on the basis of subject matter and speaker identity.  These distinctions may be

impermissible in a public forum but are inherent and inescapable in the process of limiting a

nonpublic forum to activities compatible with the intended purpose of the property."  *Perry*

*Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 (1983); *see also Families*

*Achieving Independence and Respect v. Neb. Dep't of Soc. Servs.* (*FAIR*), 111 F.3d 1408, 1422

(8th Cir. 1997) (distinguishing based on message content is not viewpoint discrimination).

Because the polling place is a nonpublic forum, the Election Day Policy need only be

reasonably related to the state's legitimate interests.  The state has a well-established, legitimate

interest in providing a safe, orderly, advocacy-free polling place.  *See Mills*, 384 U.S. at 218;

*accord Burson*, 504 U.S. at 211 (describing the history and importance of ballot secrecy and

noting that all 50 states limit access to the areas in and around the polling place).  The Election

Day Policy, like the statute, covers all political badges, buttons, or insignia.  Plaintiffs' argument

that the buttons and T-shirts in question are not political is unavailing.  In fact, as the Court

considers this case, there is a proposed legislation that would require voter identification pending

in the Minnesota House of Representatives.[8]  The Amended Complaint states that the "Please

I.D. Me" buttons were created by EIW, a "grass roots effort to protect election integrity," "in

preparation for the November 2010 Election."  EIW "disseminated its buttons and instructed its

separate organizational members and supporters" to wear the buttons in their polling places on

election day.  The language on the button intimates that government-issued identification should

be—or is—required in order to vote in Minnesota.  This intimation could confuse voters and

election officials and cause voters to refrain from voting because of increased delays or the

misapprehension that identification is required.  On this basis alone, the Court concludes that it

was reasonable to ban the "Please I.D. Me" buttons.  *Cf.* Minn. Stat. § 204C.035, subd. 1 (2010)

---

[8]      *See* H. Research, Minn. H.R., 87th Sess., Bill Summary of H.F. No. 89, third
engrossment, (Apr. 19, 2011); H. Research, Minn. H.R., 87th Sess., Bill Summary of H.F. No.
210, third engrossment, (Apr. 14, 2011).  The Court considers this proposed legislation to be a
part of the public record.  *See Friends of Lake View Sch. Dist. Inc. No. 25 of Phillips Cnty. v.
Beebe*, 578 F.3d 753, 762 n.12 (8th Cir. 2009); *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir.
2004) (taking judicial notice of publically available voting-age population statistics taken from
Virginia Division of Legislative Services website on a motion to dismiss pursuant to 12(b)(6)).

(providing criminal penalty for knowingly deceiving another individual regarding time, place, or manner of conducting an election, or the qualifications of voter eligibility for an election with the intent to prevent the individual from voting); *Burson*, 504 U.S. at 199 ("[A] State has a compelling interest in protecting voters from confusion and undue influence." (citing *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 228-229 (1989))); *Berner*, 129 F.3d at 27 ("[The] mere wearing of a pin that advocates a position regarding a hotly contested political issue raises the specter of politicization and partiality.").  In an organized effort such as this one, the buttons also identify a group of like-minded individuals, announcing their views and presence to others, increasing the potential for polarization, disruption, and intimidation at the polls.

Likewise, the Tea Party apparel communicates support for the Tea Party movement which is associated with particular views on matters of public governance.  The Amended Complaint describes the North Star Tea Party Patriots as "a coalition of local associations in Minnesota with a mission to attract, educate, organize, and mobilize citizens to secure public policies consistent with values inclusive of fiscal responsibility, constitutionally limited government and free markets."  (Am. Compl. ¶ 9)  The Amended Complaint acknowledges that the Tea Party apparel at issue "reflect[s] the[se] values."  (Am Compl. ¶ 45)  In July 2010 the U.S. House of Representatives recognized a Tea Party caucus consisting entirely of Republican members of Congress.  Mobilizing public opinion on matters of fiscal or electoral policy, or on the proper reach of government, like persuading and organizing elected representation, is "political" activity by any fair estimation.  Whether a group endorses candidates for public office is not the litmus test for whether it is a "political" organization.  Such a pinched definition of politics would be inconsistent with the fundamental premise of American democracy: the power to govern, on any number of matters that come to be of general concern, belongs to the people.

The vigorous debate about those matters is political, whether or not it finds expression in a registered political party as defined by the Minnesota Statutes.  *See* Minn. Stat. § 200.02, subd. 6 (2010).   The Court concludes that prohibiting apparel that expresses support for a political ideology is reasonably related to the legitimate state interest of "maintain[ing] peace, order, and decorum" at the polls.  *Mills*, 384 U.S. at 218; *accord Burson*, 504 U.S. at 211 ("The Court . . . has recognized that a State indisputably has a compelling interest in preserving the integrity of its election process." (quotation marks omitted)); *see also* Minn. Stat. § 204C.08, subd. 1d (2010) (voters in Minnesota "have the right to vote without anyone in the polling place trying to influence [their] vote").   Given the statements made by the apparel and buttons, and the singular purpose of the polling place, it is inconsequential that the institutional Plaintiffs are not political parties, that the institutional Plaintiffs do not endorse political candidates, and that there was no ballot measure on voter identification on the November 2, 2010, ballot.   The Court finds section 211B.11 constitutional as applied.

>3.     Vagueness Challenges

Plaintiffs challenge the constitutionality of section 211B.11 and the Election Day Policy based on vagueness.   It is not entirely clear whether the parties believe that the issue of vagueness is the subject of the Amended Complaint.   Defendant Ritchie devotes one paragraph and cites one case dealing with the issue in his reply to Plaintiffs' memorandum, as do the Hennepin County Defendants.   The Ramsey County Defendants make no mention of the vagueness doctrine in either of their submissions to the Court.   Plaintiffs' memorandum cites no cases on this point, though they do make a strenuous argument based on the lack of standards in the Election Day Policy and the statute's lack of a definition for the word political.   Given this general lack of briefing, the most reasonable conclusion is that the Amended Complaint does not

allege that Minnesota Statutes section 211B.11 is void for vagueness.  Nevertheless, a vagueness challenge would not alter the Court's conclusion with respect to Defendants' motions for dismissal.

"The void-for-vagueness doctrine is embodied in the due process clauses of the fifth and fourteenth amendments." *Woodis v. Westark Cmty. Coll.*, 160 F.3d 435, 438 (8th Cir. 1998).  A vague regulation violates the Constitution if it fails (1) to define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) to establish standards to permit enforcement of the law in a non-arbitrary, non-discriminatory manner.  *Id.* "In a facial vagueness challenge, an enactment reaching a substantial amount of constitutionally protected conduct may withstand constitutional scrutiny only if it incorporates a high level of definiteness.  An enactment imposing criminal sanctions or implicating constitutionally protected rights demands more definiteness than one which regulates the economic behavior of businesses." *Id.*  In the First Amendment context, there is the added concern that a vague statute will create a chilling effect because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.'" *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).  Unless a statute's vagueness poses a real and substantial threat to protected expression, it will not be struck down as vague. *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 59-60 (1976).  In assessing vagueness, "we are relegated . . . to the words of the ordinance itself, to the interpretations the court below has given to analogous statutes, and perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it." *Grayned*, 408 U.S. at 110.

a.      Vagueness of Statute

Count IV alleges that "the word 'political' as seen in the context of the facts of this case is facially constitutionally invalid."  (Am. Compl. ¶ 129)  Plaintiffs conflate the concept of an as-applied challenge with a facial challenge; a facial attack on a statute does not depend on the application of a specific set of facts to the language of the statute.  *See Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 133 n.10 (1992).  Nevertheless, the Court reads the complaint liberally and interprets this as a facial vagueness challenge to the statute.[9]

When examining whether a statute provides constitutionally sufficient notice, the relevant inquiry is whether the language "provides fair warning of the conduct that is prohibited" to a "person of ordinary intelligence."  *Venkelese v. City of Fargo*, 248 F.3d 738, 747 (8th Cir. 2001); *CSC v. Letter Carriers*, 413 U.S. 548, 578-79 (1973).  Section 211B.11 does not include a definition of political.  Defendants argue that the definition of political is plain and unambiguous, even without an explicit statutory definition.  *See Merriam-Webster's Collegiate Dictionary* 899 (10th ed. 2001) (defining "political" as "of or relating to government, or the conduct of government" and "of, relating to, involving, or involved in politics and esp. party politics").  In response, Plaintiffs cite several dictionary definitions of the word "political" and assert that the term is ambiguous.  (Pls.' Mem. Resp. at 15 ("[O]f or concerning government, or political affairs generally"; "of, pertaining to, or concerned with politics . . . of, pertaining to, or connected with a

---

[9]      Although not raised by either party, the Court is not without doubt as to whether Plaintiffs can mount a facial vagueness challenge when their conduct appears to have been clearly proscribed by the statute.  *See Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2719 (2010) ("[E]ven to the extent a heightened vagueness standard applies, a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice.").  Perhaps Plaintiffs' failure to seriously brief this issue, especially as to notice, is an acknowledgment that they do not have standing to bring a facial challenge based on vagueness.  However, because the issue has not been raised or briefed, the Court will address the merits of the claim.

political party"; "pertaining to politics; of or relating to the conduct of government")).  These definitions, which are substantially similar, comport with the common understanding of the word political.  The Court finds that the word "political" is not vague.  *Cf. McConnell v. FEC*, 540 U.S. 93, 241 (2003) (phrase "political matter of national importance" not unconstitutionally vague), *overruled on other grounds by Citizens United*, 130 S. Ct. 876; *Bryant v. Gates*, 532 F.3d 888, 893 (D.C. Cir. 2008) (rejecting vagueness challenge to ban on "political" advertisements); *see also FAIR*, 111 F.3d at 1415-16 (rejecting vagueness challenge to unwritten ban on "advocacy groups," defined to include "'political' groups," in nonpublic forum); *State v. Schirmer*, 646 So. 2d 890, 902 (La. 1995) (reading *Burson* to approve a "comprehensive restriction" "upon all political speech" within 100 feet of polling places).[10]  That the word "political" can be applied in various circumstances, some of which necessarily depend upon what issues are currently "involved in politics" or being discussed in relation to issues of governance, does not make its meaning unclear.  Further, that the statute regulates the polling place— historically a place of neutrality meant to provide a space "as free from interference as possible"—further supports a finding that the ban on "political" material is easily understood to include issues beyond those directly applicable to the ballot.  *Burson*, 504 U.S. at 211; *see also Boos v. Barry*, 485 U.S. 312, 332 (1988) (interpreting undefined terms in statute based on given context for which statute is crafted); *Grayned*, 408 U.S. at 108 (same).

---

[10]    That the Minnesota Supreme Court has construed "political committee" and "political fund" narrowly to avoid vagueness and overbreadth concerns in the context of campaign finance disclosure requirements, *see Minn. Citizens Concerned for Life, Inc. v. Kelley*, 698 N.W.2d 424 (Minn. 2005), does not control the Court's analysis.  *Kelley* focused on a statute modeled directly on one previously interpreted by the United States Supreme Court as requiring a narrowing construction to avoid vagueness in *Buckley v. Valeo*, 424 U.S. 1, 77-80 (1976) (narrowly construing requirement that "political committees" and all others making expenditures "to influence the nomination or election of a candidate").  Both *Buckley* and *Kelley* are inapposite because campaign finance involves a public, not a nonpublic, forum.

That the statute provides discretion to individual election judges is not by itself constitutionally fatal.  *See Ridley v. Mass. Bay Trans. Auth.*, 390 F.3d 65, 93 (1st Cir. 2004) ("The mere fact that a regulation requires interpretation does not make it vague." (citations omitted)).  Election judges will surely have to use discretion to determine whether a given expression is political, but "enforcement of all laws involves some discretion."  *Venkelese*, 248 F.3d at 747 (citation omitted).  Further, "[e]xcessive discretion and vagueness inquiries under the First Amendment are not static inquiries, impervious to context."  *Ridley*, 390 F.3d at 94-95 (citations omitted).  "[A] grant of discretion to exercise judgment in a non-public forum must be upheld so long as it is 'reasonable in light of the characteristic nature and function' of that forum."  *Id.* at 95; *see also Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1323-24 (Fed. Cir. 2002) (concluding that greater latitude ought to be afforded to officials in nonpublic fora because "'selectivity' and 'discretionary access' are defining characteristics of non-public fora, which unlike public fora are not intended to be open to all such speech").  Indeed, if election officials had not caught wind of the organized effort here, election judge discretion would have been the last bulwark between the "Please I.D. Me" buttons and the polling place.  The Court concludes that the discretion inherent in the statute is reasonable to ensure that Minnesota is able to maintain a neutral zone where voters will not be disturbed by ad hoc, of-the-moment campaigns or other movements at the polls which might disrupt or inappropriately influence voters but which may not be foreseen by the legislature.

Moreover, because the polling place is a nonpublic forum created for the limited purpose of exercising voting rights, the risk that constitutionally protected speech there will be chilled is small.  "The only expressive activity involved [in the polling place] is each voter's communication of his own elective choice and this has long been carried out privately—by secret

ballot in a restricted space." *Marlin*, 236 F.3d at 719 ("[T]he interior of a polling place . . . is not available for general public discourse of any sort."); *see Cal. Teachers Ass'n v. Bd. of Educ.*, 271 F.3d 1141, 1152 (9th Cir. 2001) ("The touchstone of a facial vagueness challenge in the First Amendment context . . . is not whether *some* amount of legitimate speech will be chilled; it is whether a substantial amount of legitimate speech will be chilled."); *accord Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989); *cf. Lehman v. City of Shaker Heights*, 418 U.S. 298, 304 (1974) (finding no First or Fourteenth Amendment violations where city prohibits "political or public issue advertising" on city public rapid transit system because "[n]o First Amendment forum is here to be found").

   b.  Vagueness and Standardless Discretion in the Election Day Policy

   Plaintiffs also appear to claim that the Election Day Policy is vague. (Am. Compl. ¶ 131) In their brief, Plaintiffs challenge the word "political," and the phrases "recognizable political views" and "issue oriented material designed to influence or impact voting." The Election Day Policy identifies five specific categories of materials as "political." The Policy refers to the Tea Party and Moveon.org as examples of organizations with "recognizable political views." "Please I.D. Me" buttons were also specifically referred to in the Election Day Policy. These examples serve to further clarify—not confuse—the meaning of the word political for individuals reading the policy. Indeed, "[t]o the extent these terms are unclear when read in isolation, they find clarity when read in context with the entire [policy]—the [policy] provides clear limiting examples illustrating the meaning of these terms." *Hunt*, 2011 WL 982475, at *8 (examining context to clarify terms "inherently communicative" and "nominal utility apart from its communication"); *see Griffin*, 288 F.3d at 1330 ("Challenged terms must be read in context of the regulation as a whole."). Persons of ordinary intelligence can conclude that if they wear

apparel that can reasonably be understood to express a political statement they may be asked to cover or remove the item while at the polls.  Thus, the Election Day Policy provides fair warning of the types of badges, buttons, and insignia that are prohibited while voting.

The Plaintiffs argue the Election Day Policy allowed "arbitrary and standardless" enforcement.  This issue arises both as part of Plaintiffs' vagueness challenge and in their separate due process claim that the Election Day Policy "exercises a standardless discretion."  The Court addresses these claims together because, though "[t]he void-for-vagueness doctrine and the excessive delegation doctrine are technically 'analytically distinct,'" the two claims overlap here.  *See Ridley*, 390 F.3d at 94; *see also Bryant*, 532 F.3d at 894 n.1.  Plaintiffs cite cases that stand for the proposition that licensing systems "which vest in an administrative official discretion to grant or withhold a permit based upon broad criteria unrelated to proper regulation of public places" are consistently condemned.  *Shuttlesworth v. Alabama*, 394 U.S. 147, 153 (1969).  Section 211B.11 is not a licensing system allowing the regulation of speech in a public forum.  *See Ridley*, 390 F.3d at 94-95 (distinguishing cases that "deal with licensing schemes regulating the exercise of speech in traditional public fora" from a regulatory scheme that is not a licensing scheme and "is neither a traditional nor designated public forum" (citation omitted)); *see also Griffin*, 288 F.3d 1321 ("All of the modern cases in which the Supreme Court has set forth the unbridled discretion doctrine have involved public fora, and no Supreme Court case has suggested that the doctrine is applicable outside of a public forum.").   "[W]hile the fact that the government may constitutionally impose content-based restrictions on speech in nonpublic fora does not insulate a regulation from an unbridled discretion challenge," a restriction within the polling place does not pose the same threats to expression as a licensing scheme in a public forum.  *See Griffin*, 288 F.3d at 1322-24 (upholding restriction on expression

on Department of Veterans Affairs property and distinguishing it from licensing schemes that restrict newspapers or other media in the public forum (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 764 (1988))). As such, the licensing cases cited by Plaintiffs are not especially germane to Plaintiffs' challenge to the policy. Given the purpose and history of the polling place, it is reasonable that election judges be given discretion to determine what is political. There exists the potential for innumerable issues to become political, though they may not ordinarily be considered so, because of an on-going national debate, local controversy, or relevance to an issue or candidate on the ballot.[11] *See Preminger v. Sec'y of Veterans Affairs*, 517 F.3d 1299, 1314 (Fed. Cir. 2008) (rejecting First Amendment unbridled discretion challenge to ban on "demonstrations" at VA Medical Centers in light of need "to maintain a place of healing and rehabilitation for veterans"); *Griffin*, 288 F.3d at 1324-25 (finding discretion reasonable to ensure the preservation of the commemorative functions of national cemeteries even where such decisions "may defy objective description and . . . vary with individual circumstances"). Further, while it is unconstitutional to enable a public official to determine which viewpoints will be permitted and which will not, *see Lewis v. Wilson*, 253 F.3d 1077, 1079-80 (8th Cir. 2001), the Election Day Policy does not allow expression of any political viewpoints. This is not a case where regulations require a speaker to receive permission to

---

[11]     To the extent Plaintiffs have argued that the Election Day Policy is an unconstitutional prior restraint, the Court finds that the statute is "not a prior restraint, but a restriction on otherwise protected speech:  'A frequent pitfall of both courts and commentators is to employ the doctrine [of prior restraint] in cases involving expression clearly within the first amendment guarantees, in ignorance of the fact that [w]here the speech in question is in all events guaranteed by the First Amendment, attributing that guarantee to the circumstance of prior restraint is at best irrelevant and often misleading.'"  *Van Bergen v. Minnesota*, 59 F.3d 1541, 1551 n.6 (8th Cir. 1995) (quoting Lawrence H. Tribe, *American Constitutional Law* 1041 (1988)).  Further, Plaintiffs are not prevented from expressing their message; they are prohibited from expressing it within the narrow area of the polling place. *Cf. Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764 n.2 (1994).

engage in speech or which permits communication in a certain manner for some but not for others; all political expressions, regardless of the view, are prohibited in the polling place.

    4.       Overbreadth of the Policy

The Court now turns to Plaintiffs' claim that the Election Day Policy is overbroad. Plaintiffs' overbreadth claim is based on their belief that the word "political" is "so broad it is overinclusive." (Pls.' Mem. Resp. at 14)  To be unconstitutional, overbreadth "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Venkelese*, 248 F.3d at 747 (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).  Where, as here, a plaintiff's overbreadth claim is based on the same factual allegations as those underpinning their as-applied challenge to a statute, review for overbreadth is inappropriate.  *See, e.g.*, *United States v. Kistner*, 68 F.3d 218, 220 n.5  (8th Cir. 1995) (citing *Van Bergen*, 59 F.3d at 1549-50) (no review for overbreadth where no significant difference between plaintiff's claim that the policy statement is unconstitutional as applied to his particular activities and his claim that the policy statement is invalid for overbreadth).

Even if review for overbreadth were appropriate, the Election Day Policy is not overbroad.  "A successful overbreadth claim must show that a challenged statute will 'compromise recognized First Amendment protections of parties not before the Court' who engage in 'conduct more likely to be protected by the First Amendment than [plaintiff's] own [conduct].'" *Ways v. City of Lincoln*, 274 F.3d 514, 518 (8th Cir. 2001) (citing *City Council v. Taxpayers for Vincent*, 466 U.S. 801, 802 (1984)).  Plaintiffs here specifically object that the Election Day Policy "restrict[s] a person from wearing an ideological statement in the polling place when the statement does not endorse a candidate or ballot question," and, in so doing, covers too broad a swath of expression.  (Pls.' Mem. Resp. 17)  As previously explained, such an

ideological statement, if it is political as understood by the common sense definition of the word, is reasonably prohibited from the polling place.  The impact of the Election Day Policy on the conduct of other speakers will not differ from its impact on the Plaintiffs.  Like the individual Plaintiffs, other individuals wearing clothing or buttons expressing political ideology or beliefs, even those unrelated to a candidate or ballot question, will fall within the policy's legitimate sweep.  *See Hill*, 530 U.S. at 731 (reasoning that comprehensiveness of statute was virtue rather than vice); *see also Marlin*, 236 F.3d at 720 ("That narrower regulations might be as effective or more so . . . does not invalidate the means the District has chosen.").  Because of the special interests at stake in the polling place—a nonpublic forum— this case is distinct from others that have analyzed similar language for overbreadth in public fora.  *Cf.  Anderson v. Spear*, 356 F.3d 651, 663-65 (6th Cir. 2004) (finding prohibition on "electioneering," defined to include speech instructing voters on how to cast absentee ballots and speech "remind[ing] voters to fill in the ovals completely," within 600-feet of polling place is overbroad); *Bauers v. Cornett*, 856 F.2d 1517, 1525-26 (8th Cir. 1989) (narrowly construing state law prohibiting state employees from soliciting financial assistance "for any political party, candidate, political fund, or publication, or any other political purposes").

    5.    Deprivation of Voting Rights

    Plaintiffs allege that Cilek was deprived of the right to vote the first time he went to his polling place.  Defendants counter that Plaintiffs have pleaded no facts connecting the individual Defendants with the violation of individual rights and so they cannot be liable for Cilek's alleged voting rights deprivation.  "[A] municipality cannot be held liable solely for the acts of others, e.g., solely because it employs a tortfeasor" "[b]ut the municipality may be held liable when execution of a government's policy or custom  . . . inflicts the injury."  *Los Angeles Cnty. v.*

*Humphries*, 131 S. Ct. 447, 452 (2010); *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010)

(plaintiffs must plead facts that plausibly show that Defendants or the "county 'itself caused the

constitutional violation at issue'").  "To establish personal liability of the supervisory defendants,

[plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a

deprivation of his constitutional rights."  *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir.

2006).  Because the Plaintiffs have not pleaded any facts connecting Defendants with the alleged

actions against Cilek, and because the Election Day Policy mandates that all individuals be

allowed to vote regardless of their compliance with the policy, Plaintiffs have failed to plead that

these Defendants unconstitutionally hindered Cilek's right to vote.

      6.     Failure to Train

     Plaintiffs also allege that Defendants did not adequately educate, train, and instruct

election judges and poll workers in a manner to avoid "intentional, reckless, or callous

indifference" to Plaintiffs' free speech, association, and voting rights.  Defendants, in turn, argue

that this claim is inadequately pleaded.  Government officials are liable in their official capacity

under 42 U.S.C. § 1983 for failure to adequately train their employees where training practices

are inadequate; the government entity was deliberately indifferent to the rights of others in

adopting the training practices; and an alleged deficiency in the training procedures actually

caused the plaintiff's injuries.  *Parrish*, 594 F.2d at 997.  Accordingly, for the Defendants to be

liable for failure to train and supervise, Defendants' alleged failure to train must have caused a

deprivation of constitutional rights.  *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001) (citing

*Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996)).  Consistent with the Court's

determination that Plaintiffs have not pleaded any violations of their rights to free speech or

association, the Court finds Plaintiffs have not pleaded a failure to train claim based on those alleged violations.

As for the right to vote, the Election Day Policy and the Amended Complaint make clear that Mansky specifically instructed election judges that "no person should be turned away from voting even if that person failed to cover up his or her 'political shirt, hat, button, badge, or insignia' particularly those wearing 'Please I.D. Me' buttons or Tea Party Patriots clothing." (Am. Compl. ¶ 59)  Given this policy, there is no set of facts which could plausibly show that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that [Defendants] can reasonably be said to have been deliberately indifferent to the need." *Ambrose v. Young*, 474 F.3d 1070, 1079-80 (8th Cir. 2007) (quotation omitted).  Plaintiffs have not pleaded facts that plausibly show improper training by Defendants related to their right to vote.

**B.      Count II:  Due Process Claims**

Plaintiffs' due process claim focuses specifically on Defendants' implementation of the Election Day Policy.[12]  Pleading a substantive due process violation requires alleging actions that violate one or more fundamental constitutional right and were shocking to the "contemporary conscience." *C.N. v. Willmar Pub. Schs., Indep. Sch. Dist. No. 347*, 591 F.3d 624 (8th Cir. 2010).  Defendants assert that Plaintiffs' due process claims should be dismissed because they "overlap fully" with their First Amendment claims and are thus subsumed by those claims.  *See Koutnik v. Brown*, 456 F.3d 777, 781 n.2 (7th Cir. 2006); *Edwards v. City of Goldsboro*, 178

---

[12]      The parties agree that Plaintiffs' Minnesota due process claim should be treated identically to their federal claim "because the due process protection provided under the Minnesota Constitution is identical to that which is provided by the federal constitution." *Sartori v. Harnschfeger Corp.*, 432 N.W.2d 442, 453 (Minn. 1988).

F.3d 231, 248 n.11 (4th Cir. 1999); *see generally Albright v. Oliver*, 510 U.S. 266, 273 (1994)

("Where a particular Amendment provides an explicit textual source of constitutional protection

against a sort of government behavior, that Amendment, not the more generalized notion of

substantive due process, must be the guide for analyzing these claims."). A review of the

Amended Complaint reveals that Plaintiffs' due process claims, with the exception of the one

allegation related to voting rights, overlap fully with their First Amendment claims. Plaintiffs do

not dispute this and the Court proceeds accordingly.

Plaintiffs allege that the Election Day Policy violated their due process rights by

interfering with their right to vote. The only facts in the Amended Complaint that support such

an allegation are those regarding Cilek's alleged voting deprivation and, potentially, the

unidentified voter who was "interrupted" while voting. The right to vote is a fundamental right

and thus, if a policy infringes on the right it must meet strict scrutiny. *See, e.g.*, *Kramer v. Union*

*Free Sch. Dist.*, 395 U.S. 621, 626 (1969). The Election Day Policy requires that all individuals

be allowed to vote, whether or not they are compliant with a request to remove political

material—the Election Day Policy does not infringe on the right to vote and is thus not subject to

strict scrutiny. Insofar as this claim is based on the enforcement of the Election Day Policy, the

Court has explained that the policy-level Defendants against whom this action is brought cannot

be held liable for violations of constitutional rights unless their actions, or the government's

policy or custom, were the moving force behind the violation. Count II is dismissed.

## C.      Count III:  Equal Protection Claim

Plaintiffs plead (1) that Defendants adopted a policy to intentionally discriminate against

the Plaintiffs; and (2) that the standardless discretion allowed by the policy resulted in

inconsistent enforcement. Defendants argue that Plaintiffs' state and federal equal protection

claims must fail because they have not shown that the Election Day Policy treated them differently than similarly situated people.  Under both Minnesota and federal law, the government is required to treat similarly situated people the same.  *See Ganley v. Minneapolis Park & Recreation Bd.*, 491 F.3d 743, 747 (8th Cir. 2007); *Beaulieu v. Mack*, 788 N.W.2d 892, 898 (Minn. 2010).

Plaintiffs argue that they have made a "class of one" equal protection claim.  The purpose of a class-of-one equal protection claim is "to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  Plaintiffs may prevail on a class-of-one claim by showing that they have been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.  *Id.*

Even assuming that the individual and institutional Plaintiffs were treated differently because of their association with one of the Plaintiff organizations, Plaintiffs have not alleged facts that plausibly support a finding that enforcement of the Election Day Policy discriminated against Plaintiffs or caused Plaintiffs' injuries.  As explained above, the Election Day Policy is viewpoint neutral.  The Election Day Policy treats similar individuals and groups similarly; the only difference with respect to the institutional Plaintiffs and other political organizations (such as Common Cause or the Sierra Club) is that the Tea Party and the "Please I.D. Me" buttons are mentioned explicitly by name.  Moveon.org is also mentioned by name in the policy, as are most of the major political parties.  Moreover, Plaintiffs have acknowledged that the coalition EIW was formed "in preparation for the 2010 election" as a "grass roots effort to protect election integrity."  After its formation, EIW created and disseminated the "Please I.D. Me" buttons to its

members to wear on election day and, subsequently, Plaintiff Sue Jeffers approached Ramsey County Elections Manager Joe Mansky about the buttons.  It was reasonable for Defendants to respond to this organized effort by educating election judges and issuing the Election Day Policy.  *Id.*; *Costello v. Mitchell Pub. Sch. Dist. 79*, 266 F.3d 916, 921 (8th Cir. 2001); *cf. United States v. Catlett*, 584 F.2d 864, 867 (8th Cir. 1978) ("While the decision to prosecute an individual cannot be made in retaliation for his exercise of his first amendment right to protest government war and tax policies, the prosecution of those protestors who publicly and with attendant publicity assert an alleged personal privilege not to pay taxes as part of their protest is not selection on an impermissible basis.").  Having been informed of an organized movement that had the potential to disrupt polling places, election officials were under no requirement to sit on their hands and refrain from giving guidance to workers at the polls.

The alleged inconsistent enforcement of the Election Day Policy—allowing some individuals to vote wearing Common Cause or the Sierra Club buttons but asking some of the individual Plaintiffs to cover their Tea Party Patriot T-shirts or EIW buttons—does not state an equal protection claim against the Defendants who wrote and promulgated the policy.  For the same reasons that Defendants are not liable for Cilek's alleged voting rights deprivation, they are not liable for any inconsistent enforcement of the Election Day Policy.  Plaintiffs have not adequately alleged an equal protection violation against Defendants.

In their response, Plaintiffs argue that they have alleged that Defendants failed to adequately train election judges and poll workers.  The Amended Complaint states, under Count I, that election judges and poll workers were not properly educated "in a manner to avoid the threatened intentional, reckless, or callous indifference to the Plaintiffs' federally protected rights of freedom of speech and association, and the right to vote."  The Amended Complaint does not

state that the failure to train caused intentional discrimination by poll workers such that their equal protection rights were violated.  Plaintiffs have failed to allege that the deprivation of their equal protection rights was caused by a failure to train.  *See Parrish*, 594 F.3d at 997 (stating elements for failure to train claim).

**D.     Secretary of State Mark Ritchie's Claim of Sovereign Immunity**

Defendant Secretary of State Mark Ritchie also claims the complaint must be dismissed as against him because he is immune from suit under the Eleventh Amendment.  Because the Court finds the Plaintiffs have failed to state a claim on which relief can be granted, the Court does not reach Ritchie's claim of sovereign immunity.  *See Beebe*, 578 F.3d at 763 n.14.

### III.     CONCLUSION

The Court concludes that section 211B.11 and the Election Day Policy are constitutional. The "right to vote freely for the candidate of one's choice is the essence of a democratic society," *Reynolds v. Sims*, 377 U.S. 533, 555 (1964), and Minnesota's strong interest in creating a neutral zone where individuals can vote free from external influence is reasonably furthered by restricting the expression of political views within the narrow confines of the polling place. Plaintiffs have failed to state a claim on which relief can be granted based on the constitutional infirmity of section 211B.11, the Election Day Policy, or on any of the alleged actions taken by these Defendants.

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.     The Defendants' motions to dismiss [Docket Nos. 43, 48, 51] are GRANTED.

2.      This action is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  April 29, 2011

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge